Ms. Jones is going to be appearing through the video. I believe she's on the line. Ms. Jones, can you hear me? Yes, I can hear you. Good, and we can hear you loud and clear. So, give us one second to just let Ms. Farkas come to the table here. All right, so Ms. Jones, you have five minutes, but you've reserved one minute for rebuttal, which means after Ms. Farkas and you'll get to go for a minute after that and respond to arguments that she makes. All right, you prepared? Ready to go? Yes. Okay, you may proceed. Okay, well, first I would like to ask the panel to allow me to proceed with my default judgment, because when I first filed the complaint, I asked for a jury trial. It was pro se, and they approved the IFP. So, with the IFP, the law states that it's the courts and the U.S. Marshals and the deputy's responsibility to make sure that all of the plaintiffs are properly served. So, that takes out their argument of not being properly served, but I made sure to directly stay in contact with Deputy Gonzalez personally to oversee the exchange. In the initial complaint, I notified the courts of the copyright infringement, stalking, threatening, and the criminal organization. And I gave plenty of chain of events that proved that I was connected to many key players in the industry. Judge Carter was notified that defendants used many tactics to delay the courts. They sent Deputy Gonzalez the spoof addresses, but Deputy Gonzalez had prior relationships with serving them, so he was able to serve everybody in New York properly. On June 17, 2022, Judge Carter, he put in a motion for the defendant to respond to my motion for injunction and impounding of all the records to prevent and restrain the copyright infringement, and to limit the magnitude of harm to be suffered by me, which is the copyright owner. I approached the defendant back in June 2021. They had seven months before I got to file the initial complaint to reply. They played around with my attorney. They put him in a holding cell, and he was, I think he was compromised. I turned in all of the emails and the papers from the Bar Association, proving that he was not even, he was barred. He wasn't even permitted to work on my case, so I had to file it on my own. Now, immediately after the courts filed the initial complaint, 2-2-22, on 2-9-22, they sold the company. They sold 300 Entertainment for $400 million. The injunction that I put in was so that they can track the labels who already began reconstructing and selling their system. They sold the song WAP, the main song that I'm suing for, to a Japanese company. Making the Italian begin doing trademarks and stuff. Furthermore, back to what I was trying to say, I'm sorry. Judge Carter, he gave the defendants a certain amount of time to respond to the injunction. He gave them multiple delays. First, he gave them 90 days because Karl Crawford was not yet served, and he's from Texas. So even though it was the court's duty to do so, I still stayed along with it and made sure that he was properly served. After he was served, he put in a letter committing perjury to the courts to delay the process, stating that he was never served properly. So I had to get an affidavit directly from the U.S. Marshals Sheriff's Office, which is form 285 on docket number 40, that proved that he was indeed served. Now, this was at the time where I already had everybody else's certificate of default filled out except his. So Judge Carter said, okay, who I'm also concerned with, because his last name is Carter, and I'm concerned that he's related to Sean Carter. Who is Jay-Z, the billionaire and manager of Megan and Stallion, one of the defendants? Again, they said, okay, well, if he was served, then I could put in for the rest of the default. So then I did, but then he began, Mr. Crawford, put in another motion to delay the process, stating that he didn't have an attorney. Now, even after I had notified the courts several times that it was an umbrella system, they're all under one umbrella. All of the record labels are connected, and the music industry is being exposed for that right now. But I notified them several times that it's a sophisticated structure that they operated with, with the monopoly. And they broke the antitrust laws, and I'm just – I see that my timer's up. But I just want to say that I should be able to – I'm asking the courts to allow me to proceed with my default judgment, or give me a jury trial like I asked in the beginning because the music industry has been using the courts to delay process and get around certain things so that they won't have to do what they're supposed to do, uphold the law. They're in default. Okay. Thank you, Ms. Jones. We're going to hear from Ms. Farkas, and then after that we'll come back to you for rebuttal. Ms. Farkas, you may proceed. I was just looking if it's morning or afternoon, so good afternoon, Your Honors. May it please the court, my name is Eileen Farkas from Prior Cashman for the appellees. Let's talk about what this case is about. This case is a copyright infringement claim over five lyrics from appellant's song. It's a song that was never commercially released. None of the music is at issue. She has brought a suit against 11 different defendants based on two different songs that some or all of them have released, claiming that each one uses a portion of these five lyrics. While her complaint alleges copyright infringement, her appeal barely addresses it, but we'd like to explain why the district court properly dismissed her claims. There are several independent reasons that the district court's decision should be affirmed. First of all, any copyright infringement plaintiff is required to plead certain elements, including access. Access to the plaintiff's work is required because one cannot copy something they've never seen or heard before. Here, like in most cases, there's no direct proof of copying, and so the plaintiff was required to allege either that her work was widely disseminated, which is a term of art in copyright infringement, or that there was a particular chain of events by which the defendants who created the songs could have gained access to her work. The appellant does not allege that her song was widely disseminated. In fact, she concedes it was never commercially released. She does not allege that any of the creators of the defendants' songs were ever received her music, ever heard her song, ever received it from anyone, or that she gave her song to someone who gave it to them. Nothing that creates a reasonable possibility that any of the defendants, much less the creators of the song, had access to her song. Instead, she just speculates. She speculates that maybe they saw her lyrics because she registered her works with BMI and ASCAP, but it's publicly available knowledge that these performing rights organizations don't publish lyrics. They don't even have the lyrics of the song. They're just registering it to collect performances. She says that she was performing with the same DJs, and she was performing all over Pittsburgh and other places. Sure. Why isn't that, like, why dissemination doesn't have to be publication? It could be lots of performances. I'm aware of no cases, and certainly none that have any factual similarity to this case, where performing in a few clubs in a city is, remotely comes close to widespread dissemination. She doesn't allege that any of the defendants, and really it's the creators of the defendant's song, who, by the way, were never served. She doesn't allege that any of them ever attended any of her performances, that any of them were ever even in those cities on whatever dates she may have performed. Well, that wouldn't be widespread dissemination. That's whether they had access through other means. So widespread dissemination, your point is that there's Performing in a few Performing in a club is not enough. Correct. Correct. It has to be so that access is inferred, that it's reasonable. For her to say that performing in a few clubs is enough, that's pure speculation. Can we move on from access? You have two minutes left in your argument. So if you have other points you want to make. I have a lot of points. Let's move on to them. So, I mean, all the remaining arguments about access are contained in our brief, that, you know, posting on YouTube and Spotify, all the things. And the DJs and the A&R that you asked about, she doesn't identify, much less say that she ever gave her song to any of them. So there's that. Then there's also the substantial similarity. Here we have words. We have two words that she claims were used in one song and two words she claims were used in another song. The district court properly dismissed her claim because there's no substantial similarity here. She cannot allege that her words are original to her. We pointed out multiple works that have used all of the lyrics that are at issue that predate her song. She doesn't dispute that. It is black-letter copyright law that words and short phrases are not protectable as a matter of law. These are words. There's no musical edge. There's nothing particularly unique about these words. What about her claim that, in addition to the words, there was some visual aspects or performance aspects that were copyrighted? What's your response? There are no visual aspects to these lyrics. She's suing on two songs. To the extent that there's a music video, if she's saying a hairstyle is protectable, it is not protectable. And, in fact, there's a case, Lane, that dealt with that very issue. No one can own a hairstyle. So there's that. So here we have words that are not copyrightable as a matter of law. They're actually expressed differently in each song. They're not identical. They're different. And there's works that predate her. There's no way that she can claim that she was the first to use these lyrics and songs because they've been used before. And to give someone a monopoly over certain words and prohibit anyone else from using them ever again, particularly when they weren't the first to use them, and they're not protectable as a matter of law, would obviously be a very dangerous thing for copyright law. The district court performs a very important gatekeeping function for claims like this. Courts routinely consider the works at issue on copyright claims and grant 12B6 motions to dismiss when no reasonable juror could find substantial similarity. Here, the district court properly denied her claim because no reasonable juror could find substantial similarity. I can briefly address her estate law claims, her stalking and harassment claims, these general. You know, I think not. But maybe just very briefly respond to the default judgment argument because that's where Ms. Jones spent a lot of time. Yeah, so this has been a theme in this case. She has moved her default time and time and time again. The district court has denied her request time and time again because the defendants have appeared through counsel. They're here appearing to the extent they were served. I don't think she takes issue with the artists and writer defendants who were never served. So the ones that she's taking issue with have been served. And, in fact, the district court in October 2022, after she made, honestly, I don't know, but at least four or five motions for default that were denied for that reason, and the district court in October 2022 prohibited her from seeking default any further without getting leave from court. And the court district court noted that in his decision, denying it once again. OK, thank you, Ms. Farkas. Thank you very much. Ms. Jones, you have a minute for rebuttal. OK, I want to trump her whole thing about saying that my music was not widely dismantled. My music. You can Google my music. My music is is the performer rights through being mad. But it's on a while. It is mental distro key. And I turned in that paperwork to the courts. This broke it gives you once you upload your music on district kids, it'll automatically send all your music to every streaming platform in the world, including title. Who is owned by Jay-Z? Who is Sean Carter making the stallions management? They own title. Mr. Leo Coral and the people that own the record labels are the same people that are in control of the streaming. So they're controlling our streaming and how we're sending out our music. My music is widely dismantled. It was on all the record label. It was on the it was on a radio. The number one radio in Pittsburgh and Charlotte in 13 different states. And I also notified the courts that I also have copyrights. It was more than just two songs. It was S.R. 915, S.R. 790, S.R. 915, S.R. 276. Those are copyright. Those are copyright numbers. It goes to every single song that they took bits and pieces of my music to. Miss Jones, could you respond briefly to the argument of Ms. Farkas that the phrases and words and concepts in your lyrics are not protectable, that they are too general to be protected under the copyright law? Well, I disagree with that because it was more than just lyrics. First of all, they stole the whole video. They stole my likeness. All my life. When they create when they create a contract, they own the artist's likeness in perpetuity for a lifetime. I own my own likeness. I'm an independent artist. All of my music I created on my own. I wrote it. I play the piano. I do my own beats. I'm independent. Everything that I have, I made on my own. So they they stole everything when it comes to the music about the courts and the jail system and all that. But it was one project. It was called the Generation X Project. They not only did that, they took my ex and they went and displayed it all over the place. They wanted to make sure that I couldn't sell merchant for merchandise or anything. They targeted my whole my whole system that I was bringing out. I was the hottest. There was no female artists out at the time. They brought out a whole bunch of artists with raspy voice. As you can see, this is my original voice. So they took my whole persona, everything about me. And they took 12 lyrics directly from my music. They thought they took all of my my video with my grandmother, pussy video. Their video is exact replica. The thought should be is exact replica of my video. The songwriter is partisan. I was in a business. I had an independent living company with his father, who is Matthew Thorpe. That's how I know Jordan Thorpe. They also say, is there anything in the record to indicate that that the father gave to his son your materials? No, I didn't know. It's not that. It's just that there was a there was like a motive. Because I had to end up in court with his father and I beat his father in court for something. So he already had a vendetta towards me after that. And when my music became so big on a platform, he already had a high position as the songwriter. He writes all of these songs. He writes all of these songs. He writes for Kanye. He writes for Drake. They use all of the same songwriters and engineers. So he was able to he was able to access my music straight from the Internet and write off the record. OK, so we're over by about three minutes, so I think we're going to stop the argument here. But thank you. We're going to reserve decision. We'll issue a written decision in due course. In the meantime, we have your briefs. And so we'll consider those as well. Thank you both.